### NEW YORK & CHARLESTON STEAM-SHIP CO. *v.* HARBISON.

*(District Court, D. Connecticut. March 24, 1883.)*

**1. PRINCIPAL AND AGENT—AGENT EXCEEDING AUTHORITY—LIABILITY.**

It does not follow, merely because an agent exceeds his authority, that he is personally liable in an action on the contract made by him.

**2. SAME—AGENT SIGNING INSTRUMENT IN NAME OF ANOTHER.**

The party who executes an instrument in the name of another, whose name he puts to the instrument, and adds his own name only as agent for that other, cannot be treated as a party to that instrument and be sued *upon it*, unless it be shown that he was the real principal.

**3. SAME—CONTRACTS OF PUBLIC AGENT IN EXCESS OF AUTHORITY—KNOWLEDGE OF CONTRACTING PARTY.**

Where a contract is made with a public agent, which the contracting party knows is made by the agent in excess of his authority, and outside of the business of the principal, but not made upon the personal credit of the agent, and where the co-contractor intentionally requires that the contract should be made in the name of the state as principal, and did not intend to look to the agent for personal liability, the agent cannot be held as principal.

**4. SAME—ELECTION AS TO WHO SHALL BE CHARGED—DISCHARGE OF OTHERS.**

Where a third party, having all the circumstances fairly before him, makes his election as to whom he will charge, the other is discharged, and he cannot turn around and sue the party discharged.

In Admiralty.

*Charles C. Leeds* and *Charles R. Ingersoll,* for libelant.

*Joseph L. Barbour* and *Lynde Harrison,* for defendant.

SHIPMAN, J: This is a libel *in personam* to recover the amount due to the libelant for the hire of the steamer Charleston, under a charter-party executed by the defendant as quartermaster general of the state of Connecticut.

The general assembly of the state of Connecticut, at its session in 1881, passed the following act:

"Section 1. The commander in chief may, at his discretion, designate a regiment of the National Guard to represent this state at the centennial celebration of the battle of Yorktown.

"Sec. 2. The spring parade and the encampment of the regiment so designated shall be suspended for the year 1881, and the members of said regiment shall be allowed the regular pay for the same number of days' service that they would receive for the parades and encampments so suspended: *provided,* that they perform that number of days' service in representing the state at Yorktown.

"Sec. 3. The quartermaster general shall provide transportation for the regiment and its camp equipage, and the sum of $3,000 is hereby appropriated therefor and for camp expenses. Any additional cost of transportation shall be borne by the regiment.

"Sec. 4. The governor and staff, and the Yorktown commissioner from this state, are requested to attend said centennial celebration, and the quartermaster general shall provide for transportation and expenses.

"Sec. 5. The commander in chief may direct the first and second companies of Governor's Foot Guards to accompany him to Yorktown: *provided,* that they will consent to go without any claim for per diem or other allowances of any sort, and will agree to pay for their own transportation, music, and commissary supplies; and in that event the sum of $1,000 is appropriated to each of said companies which accepts the conditions of this section, and actually sends at least 60 men, rank and file, with their officers, and is present at Yorktown as long as the governor directs."

The governor thereafter designated the First regiment to represent the state at the Yorktown celebration. The second company of Governor's Foot Guards accepted the conditions of the fifth section of the act.

The several companies of the First regiment voted to extend their trip from Yorktown to Charleston, South Carolina, and to assign and turn over the pay of each man to the regimental paymaster to help defray the expenses of the trip, and invited the second company of the Foot Guards to accompany the regiment. The whole amount of this pay was between $6,000 and $7,000. The Foot Guards accepted

the invitation, and agreed to accompany the regiment upon this extended trip, and that its $1,000 should be appropriated to defray the expenses of transportation. This $1,000 did not necessarily pass through the hands of the quartermaster general, but, in the ordinary course of business, would be paid directly to the company. The governor and staff also agreed to accompany the troops to Charleston.

The extension of the trip from Yorktown to Charleston was a private affair of the excursionists; and investigation to see whether the trip could be compassed with the money which was to come from the state and from the Foot Guards and from the First regiment was in the hands of a committee of arrangements, consisting of Lucius A. Barbour, the colonel, and other officers of the regiment. Upon consultation with the quartermaster general, before the vessel was hired, he estimated that he might pay $1,500 or $2,000 for the expenses of the governor and staff and Yorktown commissioner. But there was no settled agreement by the quartermaster general that he would pay so much as $2,000, though Col. Barbour reckoned, and had good reason to reckon, upon that amount in determining how the expenses of the trip were to be met. Said Barbour agreed with the defendant to indemnify him against loss by reason of any expenditure in excess of the amount for transportation, which should subsequently be determined upon by the proper authorities. Report having been made to these gentlemen that the steamer Charleston, owned by the libelants, could be procured for this trip, and that she was a proper vessel therefor, the defendant and Col. Barbour went to New York to see the vessel. The defendant returned home, while Col. Barbour remained, and representing the quartermaster general, and in his behalf, agreed upon the terms for the hiring of the vessel which were subsequently embodied in the written charter-party, a copy of which is annexed to the libel.

The charter-party purports to be entered into between the libelant of the first part, and Brig. Gen. Alexander Harbison, quartermaster general, representing the state of Connecticut, of the second part, and is signed "New York & Charleston Steamship Co.    G. W. Quintard, Pres.," and "State of Connecticut, by Alexander Harbison, Quartermaster General."    It freight lets unto the party of the second part, the steamer Charleston, "for the space of 10 days, say from October 18 to October 28, 1881," "for a voyage from New Haven or New London to Yorktown, Virginia; thence to Charleston, South Carolina; and thence to New Haven or New London, Connec-

ticut," for the sum of $6,000, half to be paid upon the signing of the charter-party, and the residue to be paid at the expiration of the charter. Three thousand dollars were paid from the funds of the state when the charter was signed. The residue never has been paid. There was no misrepresentation to Mr. Quintard in regard to the authority of the defendant. Mr. Quintard testified:

"The colonel [Col. Barbour] said the state had appropriated $3,000, and balance was to be raised by subscription. I understood that the state had appropriated $3,000, and that that was to go to Yorktown. No one represented to me that the state had made any appropriation to go to Charleston. I understood that the balance above $3,000 was to be raised by private parties."

Before the execution of the charter-party, the question arose between Col. Barbour and Mr. Quintard as to the person by whom it was to be signed. Col. Barbour offered to sign it himself, and gave Mr. Quintard references respecting his responsibility, or to carry it to Hartford for the signature of the quartermaster general, as Mr. Quintard should elect. He preferred that it should be signed by the quartermaster general.

The governor and staff and the troops went on board the vessel at New Haven on the eighteenth, arrived at Yorktown on the morning of the twentieth, thence proceeded to Charleston, where they arrived on the twenty-third of October. The vessel had been newly repaired, was not, at the date of the charter-party, upon the regular trips of the libelant between New York and Charleston, and proceeded upon this voyage with a captain and crew engaged for this especial service. She was lightly ballasted, had rather a small crew, was crowded with about 600 landsmen who were unused to sea life or to very contracted sleeping accommodations, and who soon became very seasick. The trip to Yorktown was attended with a delay at New Haven and another at or near Yorktown harbor, and the troops came very near losing any participation in the ceremonies of the centennial celebration, and thus had more than the mishaps which are apt to accompany a crowded excursion of this sort upon a steamer outside of her regular route. At Charleston, the officers, disliking exceedingly the discomforts and the risk to which the men, for whose safety they considered themselves responsible, would be exposed on the return trip, turned the vessel over to the owners, and proceeded homeward by rail. There was no adequate reason for the abandonment of the charter-party after it had been entered into. The reasons which led to its abandonment were those which might have prevented its being entered into in the first place. The defendant paid

$6,875 for the expenses of transportation from Charleston to Connecticut, of which $1,000 came from the Foot Guards, $2,000 from the appropriation for the expenses of the governor and staff, and the residue was paid by Col. Barbour.    Three thousand seven hundred dollars of the amount which Col. Barbour paid have never been repaid him.

The question in the case is whether the defendant is individually liable in an action upon the charter-party.    It is manifest that he exceeded his authority in chartering a vessel to go to Yorktown, and thence to Charleston.    It is useless to say, if the assertion is true, that the hire of the vessel to Charleston was no more than it would have been to Yorktown, because the quarter-master general was not authorized to enter into a contract for the transportation of troops to Charleston.    But it does not follow, merely because an agent exceeds his authority, that he is personally liable in an action upon the contract, though he may be liable in some way.    The counsel for the libelant did not place the defendant's liability simply upon the ground of excess of authority, but insisted that, from all the circumstances of the case, it is apparent that the defendant did not enter into the contract as the agent of the state, but as a principal, conscious that the state had given him no authority, but willing to make the contract and to enter into a private enterprise in reliance upon the security and the assurances of guaranty which were furnished him.

It is not contended that by any words or covenants in the charter-party, or that by any misrepresentation, he made himself personally liable; but the claim is that as the person who buy goods at a shop for his own use and benefit is liable, although, for convenience sake, the form of the contract may have been in the name of the alleged principal, so the defendant is liable in this case.

The law, as stated in *Jenkins* v. *Hutchinson*, 13 Q. B. 743, was not denied by either party to be the law of the case.

" In the absence of any direct authority, we think that a party who executes an instrument in the name of another, whose name he puts to the instrument, and adds his own name only as agent for that other, cannot be treated as a party to that instrument and be sued *upon it*, unless it be shown that he was the real principal."

The opinions of the several judges in *Lewis* v. *Nicholson*, 12 Eng. Law & Eq. 430, are to the same effect.    *Jefts* v. *York*, 4 Cush. 371; *White* v. *Madison*, 26 N. Y. 117.

The question, then, is, was the defendant the real principal, instead of the state of Connecticut, which was named in the contract as the contracting party?

The First regiment desired to go, not merely to Yorktown, but to Charleston. This extension of the trip was a private affair, with which the state had nothing to do, and at the desire and request of the officers of that regiment, the defendant, ostensibly as quarter-master general, hired the steam-ship to go to Yorktown, and thence to Charleston, and to return to Connecticut, for the sum of $6,000, He had no funds for a trip to Charleston, but he had authority from the state to pay $3,000 for the transportation of the first regiment, and to provide for the expenses of the governor and staff upon a trip to and from Yorktown, and a promise from the Foot Guards that they would pay him $1,000; and he evidently had, also, prudent misgivings whether it would not be extravagant to appropriate $2,000 for the expenses of the governor and staff upon the steam-ship. He hired the vessel, not because he was acting in that regard for the state, but because he was acting in behalf of a party of excursionists.

If there were no other facts in the case, and it rested at this point, there would be, in my opinion, no escape from the conclusion that the defendant was the principal in the transaction. But in addition to these facts there are others which are important. The libelant knew that the defendant was exceeding his authority, and that the state was not the principal. Mr. Quintard was told that the state had appropriated but $3,000, which was for expenses to Yorktown, and that the balance was to be made up by outside parties. He knew, therefore, that the defendant was only nominally representing the state. The colonel of the regiment offered to sign the charter-party and gave references as to his responsibility. Mr. Quintard elected to take the state as his debtor, and required that the charter-party should be signed by the state's representative. When he so requested he did not intend to look to Mr. Harbison personally. He negatived the idea of personal liability, and proposed to look only to the state. When these circumstances combine,—viz., a contract with a public agent which the co-contracting party knows is made by the agent in excess of his authority and outside of the business of the principal, but not made upon the personal credit of the agent, and where the co-contractor intentionally requires that the contract should be made in the name of the state, and did not intend to look to the agent for personal liability,—it is an artificial and

strained conclusion that the agent, although he was exceeding his authority, and, in relation to the excess, was acting as the organ of an association of private individuals, should be declared to be the principal.

I am not controlled by the fact that Mr. Quintard knew of the excess of authority. This case does not come within a class of cases in which a contract was executed by a public or private agent in excess of his authority, and the co-contracting party knew or had reason to know of such excess, but where the business was really that of the principal and not of the agent; as where an agent, appointed by authority of a court to build a bridge, had built it, but the decree or order of the court was subsequently declared to be invalid, or where the principal who had given the authority had died without the knowledge of the agent. In such case, the agent who has made no guaranty of authority, and who was not contracting for himself, is not liable. *Perry* v. *Hyde*, 10 Conn. 329; *Smout* v. *Ilberry*, 10 Mees. & W. 11; *Murray* v. *Carothers*, 1 Metc. (Ky.) 71; *McCurdy* v. *Rogers*, 21 Wis. 199. In this case the defendant was not sending the vessel to Charleston for the benefit of the state.

Neither would the fact, in the absence of Mr. Quintard's knowledge of the agent's power, that he did not give the credit to Mr. Harbison, and did not intend personal liability, be sufficient to free the defendant from liability. But when the facts combine that Mr. Quintard knew that the agent was exceeding his authority, and that the state could not be liable, and yet refused personal liability, and preferred that the contract should be in the name of the state, and virtually negatived the idea of the defendant's personal liability by asking that the contract should be in the name of the state, I am of opinion that these facts exclude the idea that he is or was a principal.

Mr. Quintard was made acquainted with the purposes for which the vessel was wanted, and with the extent of the state's connection with the trip, and with the way in which the money was expected to be raised, and was then asked: "Who will you take as your contracting party?" He replied: "I prefer to take the quartermaster general; that is, I will take the state." He preferred this course, with no improper intention or motive towards the state, but thinking that the money would be paid, and that it was not very important who did sign the contract, but that as a part of the business was the state's, it was preferable to have its signature. When, with full knowledge of all the facts, he chose to take the probabilities of payment from the state, or through the state, or through third persons, and showed

by his acts that he had no intention of looking to the agent, he made his election, and cannot thereafter make the defendant liable under the contract. "It must be understood in all cases, where a third person, having all the circumstances fairly before him, makes his election as to whom he will charge, the other is discharged, and he cannot turn around and sue the party discharged." Petgr. Princ. & Ag. 159.

Let a decree be entered for the defendant.

On appeal to the circuit court this case was reversed. See *infra.*